1  Richard A. Hoyer (SBN 151931)
   *rhoyer@hoyerlaw.com*
2  Ryan L. Hicks (SBN 260284)
   rhicks@hoyerlaw.com
3  Nicole B. Gage (SBN 318005)
   *ngage@hoyerlaw.com*
4  HOYER & HICKS
   4 Embarcadero Center, Suite 1400
5  San Francisco, CA  94114
   *tel* (415) 766-3539
6  *fax* (415) 276-1738

7
   Attorneys for Plaintiffs
8  JANELLE ALLEN, SARA BURTON,
   CHRISTIE OROZCO, and ROYALL WALTERS
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 12 JANELLE ALLEN, SARA BURTON, CHRISTIE OROZCO, and ROYALL 13 WALTERS, | Case No. |
| | **COMPLAINT FOR DAMAGES** |
| 14       Plaintiffs, | **1) Failure to Accommodate in Violation of the Americans with Disabilities Act of 1990 ("ADA")** |
| 15       vs. | |
| 16 BARULICH, DUGONI, AND SUTTMAN LAW GROUP, INC. AND DOES 1-25, 17 | **2) Failure to Accommodate in Violation of the Fair Employment and Housing Act ("FEHA")** |
| 18       Defendants, | **3) Failure to Engage in the Interactive Process in Violation of the ADA** |
| 19 | **4) Failure to Engage in the Interactive Process in Violation of FEHA** |
| 20 | |
| 21 | **5) Nonpayment of Wages in Violation of Labor Code §202** |
| 22 | **6) Waiting Time Penalties in Violation of Labor Code §202** |
| 23 | |
| 24 | **DEMAND FOR JURY TRIAL** |

1    Plaintiffs Janelle Allen, Sara Burton, Christie Orozco, and Royall Walters, (hereinafter
2    "Allen," "Burton," "Orozco," "Walters," or collectively "Plaintiffs") bring this action against
3    Defendant Barulich, Dugoni, and Suttman Law Group, Inc. ("BDS" or Defendant), and allege
4    as follows:

5    **<u>NATURE OF THE ACTION</u>**

6    1.    Plaintiffs worked as an attorney and support staff at BDS (formerly Barulich Dugoni
7    Law Group, Inc.). Around November 2017, they began to smell smoke around the office and
8    found dust and debris covering their work areas. Although they could not ascertain the source
9    of the pollutants right away, they quickly realized the air was hazardous to breathe. Initially,
10   they were coughing, unable to breathe, became lightheaded, and suffered from headaches
11   and severe sore throats. After prolonged exposure, they began to suffer from more serious
12   health issues, including asthma attacks, ear infections, and upper respiratory infections.
13   Plaintiffs determined that the contaminants were coming from a floor above their office space
14   in which construction workers had breached the casing over a vent. The construction workers
15   temporarily halted construction, but resumed shortly thereafter. Over the next few months,
16   Plaintiffs repeatedly complained to Executive Director Steve Parker ("Parker") and managing
17   partners, Paul Barulich ("Barulich") and Larry Dugoni ("Dugoni"). They were met with
18   sarcastic responses that belittled their worsening health conditions, despite the fact that they
19   all had notes from their physicians expressly linking their health problems to the toxic air at
20   work. Their doctors required they be accommodated and allowed to work from home, which
21   did not interfere with their work duties, but BDS refused to accommodate Plaintiffs. Eventually
22   the conditions became so unbearable that Allen, Orozco, and Walters had no reasonable
23   alternative but to resign. Allen was not paid all wages due upon her termination. Burton has
24   been out on unpaid medical leave since May 21, 2018 and BDS has refused to accommodate

1    her.

2    **PARTIES**

3    2.      Plaintiff Janelle Allen was, at all relevant times herein, a resident of the State of

4    California and employed by Defendant BDS to work at its law firm in San Mateo, California.

5    3.      Plaintiff Sara Burton was, at all relevant times herein, a resident of the State of

6    California and employed by Defendant BDS to work at its law firm in San Mateo, California.

7    4.      Plaintiff Christie Orozco was, at all relevant times herein, a resident of the State of

8    California and employed by Defendant BDS to work at its law firm in San Mateo, California.

9    5.      Plaintiff Royall Walters was, at all relevant times herein, a resident of the State of

10   California and employed by Defendant BDS to work at its law firm in San Mateo, California.

11   6.      Defendant BDS operates a law firm in San Mateo, California that largely represents

12   clients with regard to estate planning issues. At all relevant times, Defendant was Plaintiffs'

13   employer.

14   **JURISDICTION AND VENUE**

15   7.      The ADA authorizes private rights of action to recover damages for violation of its non-

16   discrimination provisions. 28 C.F.R. §36. This Court has original federal question jurisdiction

17   under 28 U.S.C. §1331. This Court has supplemental jurisdiction over the California state law

18   claims under 28 U.S.C. §1367(a) because they are so related to this action that they form

19   part of the same case or controversy.

20   **8.**      Venue in this district is proper pursuant to 28 U.S.C. §1391(b). At all material times

21   Defendant has been actively conducting business in the State of California and within the

22   geographic area encompassing the Northern District of the State of California.

23   **FACTUAL ALLEGATIONS**

24   9.      Around November 2017, Plaintiffs began to notice that the air in Defendants' office

space was contaminated. Shortly after, they began to suffer from various health issues that continued to worsen over time. They eventually ascertained that the air was being polluted from construction work being done improperly and without permits on the floor above their office. BDS conducted tests of the air and they came back indicating that it was "clean," but the tests were not reliable or thorough and Plaintiffs continued to suffer health issues when exposed to the hazardous air. Furthermore, BDS refused to accommodate Plaintiffs by preventing them from working at home or, in some cases, wearing masks in the office. Eventually, Plaintiffs Allen, Orozco, and Walters felt they had no reasonable alternative but to resign. Plaintiff Burton has been on medical leave for almost a year.

10.     Plaintiff Janelle Allen:

a.      Allen worked as an Associate Attorney at BDS from April 2016 through April 2018. Around November 2017, she began to smell smoke around the reception area in the office. The smell did not disappear, and within a day or two, she noticed that her work area was covered in dust and debris resembling small white pebbles. Within the week, she began experiencing initial symptoms related to the air quality such as a hoarse and strained voice. In the office, she began to wear scarves around her nose and mouth.

b.      On November 20, 2017, Allen filed a Worker's Compensation claim.

c.      On December 8, 2017, Allen spoke with Parker about the air quality and emailed the Board of Directors explaining how the air was making her sick. That day, she also left work early to go to the doctor because she was vomiting at work, had a hoarse voice, throat pain, and general discomfort. Allen saw Jennifer White ("White") at U.S. Healthworks in San Francisco. White ordered BDS to accommodate Allen and allow her to work from home due to the debris.

d.      Despite this clear order, BDS constantly pressured Allen to come into work

throughout the day by texting and emailing her in the mornings asking where she was and whether she was coming into the office. Eventually, White had to put the work from home restriction in all capital letters, because BDS continually harassed Allen instead of accommodating her. On December 21, 2017, Allen had a performance review with Parker, during which she brought up the firm's poor handling of the air issues. Parker was very defensive.

e.    On January 12, 2018, Allen was cleared by her doctor to return to work; however, after only a few hours in the office, she began to experience a scratchy throat and itchy eyes. She emailed Barulich and Dugoni explaining her symptoms and requesting to work from home the following Monday. They pressured her to work in the office, so she bought special masks to wear that could block small particulate fiberglass, as she was unsure what exactly was in the air and causing her such severe issues.

f.    On January 17, 2018, Allen noticed the air filtration unit in her office was blinking red throughout the evening, indicating the air quality was poor. The light had been blue earlier in the day. Allen emailed the office directors explaining that the indicator light was potentially useful information and that perhaps the air testing was not being done during the right time of day to capture the contamination. Allen requested a test be done to check for small airborne fiberglass particles, as those are generally missed in air testing and seemed to be a possible culprit. The test was not conducted until March 15, 2018 (two months later).

g.    On January 18, 2018, Allen sent the directors a work status report from her doctor indicating she now had a double ear infection and was placed on antibiotics. Earlier that day, Dugoni expressed that she could not possibly have an ear infection from the air. He consistently belittled her health condition and insinuated she should return to work.

h.    On January 31, 2018, Roberta Chopa ("Chopra") began working as the new

1    Human Resources Manager at BDS. During her first staff meeting, Parker said something to

2    the effect of "we need people to stop complaining about the air." On February 27, 2018, Allen

3    met with Chopra to discuss how Barulich and Dugoni continually harassed her to come into

4    the office by calling her nearly every morning. She explained how they questioned the validity

5    of her health condition and pressured her to go into work despite there being no necessity

6    for her to be there in person and her doctor's note explicitly ordering BDS to accommodate

7    her by allowing her to work from home.

8         i.    On March 21, 2018, White informed Allen that a Liberty Mutual Case Manager

9    went to see her and pressured her to close all of the open worker's compensation claims with

10   BDS. She said the air results from testing came back clean and exclaimed "let them quit!"

11   White explained that closing the cases did not make sense, as everyone's symptoms

12   returned when they went into the office and were exposed to the air.

13        j.    On March 24, 2018, Chopra denied Allen's request to have her office cleaned.

14   She noted that she had "dusted" the office where Allen was sitting temporarily. On March 28,

15   2018, Chopra emailed everyone in the office that it had been determined there were no toxins

16   or pathogens in the suite and that the air was certified acceptable for workplace occupancy.

17   Allen responded that she was still feeling effects of the air contamination and requested a

18   copy of the report. That same day, Allen was diagnosed with a serious upper respiratory

19   infection.

20        k.    On March 30, 2018, after months of exposure to the toxic air, worsening health

21   symptoms, and BDS' failure to accommodate her, Allen gave two weeks' notice that she

22   would be resigning. At that time, she also brought up that when she began working at BDS,

23   she was promised two months' worth of wages ($12,692.31) to be given in the form of a

24   bonus at the end of 2016, and she never received those wages despite Parker's repeated

1   assurances.

2       l.      Throughout April 2018, Allen continued to go to doctor's appointments and was

3   diagnosed with a serious upper respiratory infection and prescribed an aggressive course of

4   antibiotics along with various nasal sprays, Claritin, a sinus lavage, and an inhaler. She is

5   still suffering from effects of the air at BDS and has been advised that she could develop

6   more serious health issues in the future, such as cancer.

7   11.    Plaintiff Sara Burton:

8       a.      Burton has worked as an Office Coordinator for BDS since March 2017.

9   Around November 2017 she began smelling smoke near her desk and very quickly began

10   to experience headaches and irritation of her sinuses. The smell was particularly pungent

11   around the reception area of the office, where she worked. Throughout the day, employees

12   would walk by and discuss how the air smelled much worse in the reception area. Burton

13   constantly felt sick and brought up the issue in staff meetings along with many other

14   employees.

15       b.      Around November 21, 2017, Burton told Parker she was getting sick from the

16   air. He responded that she could not be getting sick and walked away. Whenever she

17   brought up the air quality with Parker, he would get very defensive and belittle her health

18   conditions. Burton wanted to move to a different area of the office, but was too afraid to talk

19   to Parker about it because he was so reactive and defensive whenever she mentioned the

20   air. Another employee, Rita Arnold ("Arnold"), eventually spoke with Parker on Burton's

21   behalf, explaining that Burton should be able to work in the conference room where she

22   could easily see clients come in and would be able to perform her job without jeopardizing

23   her health. After a heated argument, Parker agreed, but only allowed Burton to work there

24   for one day. That day, the air quality was so bad that BDS allowed all employees to leave

COMPLAINT FOR DAMAGES             7

1   work early.

2       c.      Burton had to frequently leave work early due to her symptoms, and

3   eventually went to a doctor who believed her health issues were directly related to the

4   contaminated air at work. In late November 2017, Burton spoke with the financial controller,

5   Jennifer Choi Cheng ("Choi Cheng") about filing a worker's compensation claim. Choi

6   Cheng tried to dissuade her. Burton filed a worker's compensation claim anyway.

7       d.      Around the same time, Burton again asked Parker if she could move to

8   another area of the office, but he did not allow her to do so and instructed her to decorate a

9   Christmas tree directly under a vent by the reception area. She complied out of fear, but as

10  she was decorating the tree, her chest began to hurt more than usual and she had to go

11  home around 12:00 p.m. because her symptoms were so severe. Later that day, she

12  learned the office had been shut down by the fire department.

13      e.      On December 1, 2017, Burton's doctor told her that her lungs were

14  functioning at 50% capacity. Burton was not surprised as she was having trouble breathing,

15  walking short distances, and talking on the phone. The doctor gave her an inhaler,

16  requested a further medical follow up and occupational health appointment, and told her

17  she needed to stay away from the office for at least one week. At that point, the

18  occupational health provider would establish a course of treatment for her.

19      f.      At her occupational health appointment, the provider excused Burton from

20  work because she had a series of infections that were not improving. On January 10, 2018,

21  Burton went to a pulmonologist who diagnosed her with asthma, which developed from the

22  heavy exposure to the contaminated air at work. The provider warned her not to return to

23  the workplace or she could have an asthma attack immediately. Around that time, Burton

24  heard that various Board members were expressing contempt about her absences. Parker

insinuated that Burton was somehow taking advantage of the firm and downplayed her illness to other employees.

g.      Over the next few months, Burton's health worsened. She began having fevers in March and took over the counter flu medicine almost daily. She continued using ear drops and nasal spray as well. On the evening of March 17, 2018, she had a high fever and found dark red discharge in her ear. She wanted to go to the emergency room, but at the time she was unclear on her health insurance and employment status. Burton went to urgent care and saw White a few weeks later. White was shocked at the state of Burton's ears and general health. She firmly believed the symptoms were caused by the air at work. White also told Burton that Parker had called her in response to another employee trying to open a worker's compensation claim and he had insinuated that Burton and her colleagues were all liars.

h.      On May 16, 2018, Burton received correspondence from Chopra placing her on unpaid leave beginning May 21, 2018. Burton remains on medical leave to this day.

i.      Burton continues to suffer the same symptoms of ear, nose, and throat pain. She also experiences asthma and acid reflux symptoms regularly, and requires medication for both.

12.   Plaintiff Christie Orozco:

a.      Orozco worked at BDS as an Estate Planning Paralegal from November 2013 to June 1, 2018. She began to notice debris and dust covering her desk around November 2017 and began to experience initial reactions to the air such as coughing and a sore throat.

b.      The air quality in the office affected Orozco so severely that she began experiencing asthma attacks and had to go to the emergency room multiple times a week

from November 2017 through May 2018. Orozco had asthma since childhood, but prior to November 2017 she did not have constant asthma problems or require daily preventative asthma medication.

c.     Orozco experienced her first work-related asthma attack on November 29, 2017. That day, the fire department came and shut down the office because of the poor air quality. They administered albuterol to Orozco on site.

d.     Orozco continued to experience health issues at work, and on December 28, 2017, she requested to work from home for the first time. The request was granted, and while Orozco had difficulty breathing, her symptoms initially improved when she was away from the office.

e.     Throughout January 2018, Orozco was patient as the air was being tested and hopeful that conditions would improve; however, she and others continued to experience health issues. On January 11, 2018, Orozco requested more masks for people to wear in the office, as many were having trouble breathing and suffering from throat pain. The following week, Orozco developed allergy-like symptoms in addition to the breathing problems she was already experiencing, and her eyes began to bother her.

f.     Over the next few weeks, Orozco continued to have asthma symptoms and experienced severe headaches when she went into work. The air quality seemed to have worsened, and on February 14, 2018, she requested to work from home again. On February 15, 2018, an optometrist diagnosed Orozco with blurred vision due to allergy-like symptoms caused by the air at work.

g.     On February 16, 2018, Orozco went into work but had to leave early due to asthma symptoms. After the air test results came back in February, Orozco was asked many times to remove her mask in the office because the air was "clean." Barulich did not

COMPLAINT FOR DAMAGES                                                                                                    10

1   want clients to see employees wearing masks. Employees were supposed to remove

2   masks to go to the restroom or to pass the front desk and reception area. Orozco was not

3   allowed to wear a mask in meetings, but she constantly expressed that she felt sick from

4   the air and could not take her mask off.

5        h.      On March 28, 2018, Chopra received a report indicating that the air was

6   clean, but Orozco's health conditions only worsened. Chopra continued to refer to the air as

7   clean when Orozco complained about health issues. She also continued to ask Orozco for

8   additional doctors' notes, despite the fact that Orozco had a note that was valid for several

9   months.

10        i.      On April 5, 2018, Orozco left work early to go to Urgent Care because she

11   was experiencing more severe symptoms that caused coughing spells so severe that they

12   kept her up at night. The doctor told her not to go into work the next day. That weekend,

13   Orozco remained sick and went to the emergency room because her asthma symptoms

14   continue to worsen, even with medication. Since the medication was not working, the

15   doctors required Orozco to avoid asthma triggers, continue using the medication, and

16   return to the ER if needed. At this point, she was going to the ER an average of two to three

17   times per week to control her asthma triggered by the air in the office.

18        j.      Throughout April 2018, Orozco continued to suffer. On April 19, 2018, she

19   requested to move desks because the air near her desk was particularly dusty. Her

20   request, however, was denied. There was no reason that Orozco could not have performed

21   her job duties from a different desk, and several were vacant at the time.

22        k.      Many times, Orozco would request to leave work to go to the ER, but Parker

23   told her she needed to check in with the team before going to the hospital. Barulich and

24   Dugoni also gave Orozco a hard time about her requests to leave. She was told to finish a

project or complete a signing before leaving to seek necessary medical attention. When Orozco was able to work from home, BDS continually asked her to come into work for signings, despite her doctor's note requiring she work from home whenever possible. They claimed Orozco had to be there in person because her name was listed as a witness or notary, but nearly everyone in the office was a licensed notary. Orozco asked on many occasions to have another employee cover the signings, but her requests were denied. When she did come in to do the signings, Dugoni would often refer to the mask she was wearing and insinuate that she needed to remove it before the seeing the clients. Barulich specifically told Orozco she was not allowed to wear a mask during a meeting with an important client.

l.      On May 15, 2018, Orozco overheard the receptionist having a conversation with someone on the phone regarding the removal of case-related file boxes in the office across from hers. She heard the person on the phone say the boxes tested positive for mold and mildew, and BDS had them removed by a professional cleaning company that specializes in removing contaminated items.

m.      On May 18, 2018, concerned that her health was deteriorating from the toxic air and frustrated that BDS was unwilling to accommodate her, Orozco resigned.

n.      Orozco's last day at BDS was June 1, 2018, although she worked from home for at least a week at the end of her employment. At that point, she was taking many medications which gave her bad side effects and her health had deteriorated so badly that she could not walk short distances or talk on the phone for long periods of time without having an asthma flare-up.

13.    Plaintiff Royall Walters:

a.      Walters worked at BDS as a Litigation Assistant from November 21, 2016

1   through May 8, 2018. She began experiencing symptoms from the air quality at work very

2   early on. At first, she noticed that her eyes were irritated and her throat was sore. Around

3   the beginning of December 2017, however, her symptoms had worsened so much that she

4   spoke with Parker to report that she was going to see a doctor regarding the symptoms she

5   was experiencing due to the air.

6       b.      On December 11, 2017, Walters had her first doctor's appointment to discuss

7   her breathing issues, itchy eyes, and sore throat. A couple of weeks later, she went to U.S.

8   Healthworks and reported the same issues, along with severe migraines that she had

9   begun to experience. Walters used eye drops and over the counter medicines, but her

10  symptoms continued to worsen with time.

11      c.      On January 16, 2018, Walters saw Dr. Heather Guilbault who listened to her

12  breathing and said she could hear something in her lungs. She recommended Walters see

13  a pulmonologist as well as a neurologist for the migraines she had been experiencing. On

14  January 26, 2018, Walters met with White for the first time, who had also been seeing

15  others from the office, and recommended that Walters work from home.

16      d.      Throughout February 2018, Walters' health progressively worsened. She

17  began to experience migraines nearly every day. They were so severe that she was

18  nauseous, had no appetite, was photosensitive, and lethargic. At the beginning of February,

19  White prescribed Walters Norco for her migraines.

20      e.      Throughout February 2018, Walters went into work about ten days' total. She

21  went in because she was hopeful that the air would be better, but every time she entered

22  the building her symptoms would return and worsen. In March 2018, Walters felt very

23  pressured to return to working in the office because she received frequent texts asking

24  where she was and when she would return to the office.

**COMPLAINT FOR DAMAGES**                                                    13

f.      Around this time, Walters was about to have jaw surgery, which she needed because her jaw was underdeveloped and she had a lot of pain in her jaw muscles. At one point, Chopra asked Walters whether her jaw issues caused headaches or migraines, trying to insinuate that her complaints about the air were unfounded. Walters explained that she had never suffered any symptoms such as migraines, sore throat, or itchy eyes before the air quality deteriorated, and that her jaw issues only caused her to feel weak, sore, and have a very tired jaw muscle.

g.      Around April 6, 2018, Walters' health began to deteriorate even further. Her eyes were constantly itchy to the point where she felt like she could not wear contacts. She also had extremely swollen glands in her throat which caused her to have trouble swallowing. White noted that Walters' lungs sounded polluted and that she had a fungal infection in her ears. She immediately gave Walters a strong breathing treatment and prescribed her with a course of antibiotics and steroids. Still, Chopra repeatedly told Walters she needed to think about the needs of her team and continually disregarded Walters' work status from her doctors.

h.      After months of worsening health and no accommodation on BDS's part, Walters felt she had no choice but to resign. She gave notice on April 27, 2018 and her last day of work was May 8, 2018.

14.     The above allegations are incorporated by reference in each and every cause of action stated below.

## FIRST CAUSE OF ACTION

### Failure to Accommodate in Violation of the ADA
### (All Plaintiffs)

15.     Defendant is an employer covered by the ADA. It employs approximately twenty-five

1   (25) individuals.

2   16.    At all relevant times herein, Plaintiffs were employed by Defendant.

3   17.    Plaintiffs each had a disability as defined by the ADA. They suffered from physical

4   conditions, caused by the toxic air in their workplace, that substantially limited one or more

5   of their major life activities.

6   18.    Plaintiffs each informed Defendant of their respective disability and requested to be

7   accommodated.

8   19.    There was an accommodation available for each Plaintiff that would not have posed

9   an undue hardship to Defendant.

10   20.    Defendant failed to provide an accommodation to any Plaintiff.

11   21.    Plaintiffs were harmed.

12   22.    Defendant's unlawful conduct, as alleged herein, was a substantial factor in causing

13   Plaintiffs' harm.

14
15                          **<u>SECOND CAUSE OF ACTION</u>**

                       **Failure to Accommodate in Violation of FEHA**
16                                   **(All Plaintiffs)**

17   23.    Defendant is an employer covered by FEHA.

18   24.    At all relevant times herein, Plaintiffs were employed by Defendant.

19   25.    Plaintiffs each had a disability as defined by FEHA. They suffered from physical

20   conditions, caused by the toxic air in their workplace, that substantially limited one or more

21   of their major life activities.

22   26.    Plaintiffs each informed Defendant of their respective disability and requested to be

23   accommodated.

24   27.    Plaintiffs were able to perform their essential job duties with reasonable

**COMPLAINT FOR DAMAGES**                                                          15

1    accommodation for their respective disabilities.

2    28.    Defendant failed to provide an accommodation to any Plaintiff.

3    29.    Plaintiffs were harmed.

4    30.    Defendant's unlawful conduct, as alleged herein, was a substantial factor in causing

5    Plaintiffs' harm.

6
                              **THIRD CAUSE OF ACTION**

7
                    **Failure to Engage in the Interactive Process in Violation of the ADA**
8                                       **(All Plaintiffs)**

9    31.    Defendant is an employer covered by the ADA. It employs approximately twenty-five

10   (25) individuals.

11   32.    At all relevant times herein, Plaintiffs were employed by Defendant.

12   33.    Plaintiffs each had a disability as defined by the ADA. They suffered from physical

13   conditions, caused by the toxic air in their workplace, that substantially limited one or more

14   of their major life activities.

15   34.    Plaintiffs each informed Defendant of their respective disability and requested to be

16   accommodated.

17   35.    There was an accommodation available for each Plaintiff that would not have posed

18   an undue hardship to Defendant.

19   36.    Defendant refused to engage in an interactive process with any Plaintiff to identify

20   and implement reasonable accommodations.

21   37.    Plaintiffs were harmed.

22   38.    Defendant's unlawful conduct, as alleged herein, was a substantial factor in causing

23   Plaintiffs' harm.

24

**COMPLAINT FOR DAMAGES**                                                            16

## FOURTH CAUSE OF ACTION

### Failure to Engage in the Interactive Process in Violation of FEHA
### (All Plaintiffs)

39.     Defendant is an employer covered by FEHA.

40.     At all relevant times herein, Plaintiffs were employed by Defendant.

41.     Plaintiffs each had a disability as defined by the FEHA. They suffered from physical conditions, caused by the toxic air in their workplace, that substantially limited one or more of their major life activities.

42.     Plaintiffs each informed Defendant of their respective disability and requested to be accommodated.

43.     Plaintiffs were able to perform their essential job duties with reasonable accommodation for their respective disabilities.

44.     Defendant refused to engage in an interactive process with any Plaintiff to identify and implement reasonable accommodations.

45.     Plaintiffs were harmed.

46.     Defendant's unlawful conduct, as alleged herein, was a substantial factor in causing Plaintiffs' harm.

## FIFTH CAUSE OF ACTION

### Nonpayment of Wages in Violation of Labor Code §202
### (Plaintiff Janelle Allen)

47.     Plaintiff Allen performed work for Defendant.

48.     Defendant owes Plaintiff Allen wages under the terms of the employment.

49.     Pursuant to an oral contract, Defendant owes Allen $12,692.31 in unpaid wages, exclusive of any interest or penalties recoverable under California law.

**SIXTH CAUSE OF ACTION**

**Waiting Time Penalties in Violation of Labor Code §202**
**(Plaintiff Janelle Allen)**

50.     Defendant's conduct, as alleged herein, constitutes a violation of Lab. Code § 202(a), which requires an employer to pay an employee who resigns all earned and unpaid wages at the time of resignation, provided the employee provides 72 hours' notice of her intention to resign.

51.     Plaintiff Allen provided 72 hours' notice of her intent to resign.

52.     Defendant wilfully failed to pay Plaintiff Allen all wages owed at the time of her resignation.

53.     As a direct result of Defendant's unlawful employment practices, as alleged herein, Plaintiff Allen has been injured and is entitled to recover statutory penalties under Lab. Code § 203(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment against Defendant as follows:

1.     For an award of damages to Plaintiffs against Defendant, including economic damages, waiting time penalties, and for any punitive or penalty damages allowed under California law;

2.     Costs and expenses of this action incurred herein, including reasonable attorneys' fees and expert fees;

3.     Pre- and post-judgment interest, as provided by law;

4.     All applicable statutory penalties arising from Defendant's unlawful conduct, as alleged herein;

5.     Injunctive and declaratory relief; and

6.      Any and all such other and further legal and equitable relief as this Court deems necessary, just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all causes of action and claims to which they have a right to jury trial.

Date:  May 16, 2019                          HOYER & HICKS


_____
Richard A. Hoyer
Ryan L. Hicks
Nicole B. Gage
Attorneys for Plaintiffs
JANELLE ALLEN, SARA BURTON,
CHRISTIE OROZCO, and ROYALL
WALTERS